# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| Bonnie Williams | : **CASES CONSOLIDATED** |
| | : |
| v. | : |
| | : |
| City of New Castle and Police | : |
| Pension Board for the City of | : |
| New Castle, | : |
| Appellants | : No. 1088 C.D. 2023 |
| | |
| Laura Crawford | : |
| | : |
| v. | : |
| | : |
| City of New Castle and Police | : |
| Pension Board for the City of | : |
| New Castle, | : No. 1089 C.D. 2023 |
| Appellants | : Argued: February 5, 2025 |


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE LORI A. DUMAS, Judge
          HONORABLE STACY WALLACE, Judge
          HONORABLE MATTHEW S. WOLF, Judge


<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE WALLACE                                    FILED:  April 16, 2025


The City of New Castle (City) and the Police Pension Board for the City of

New Castle (Pension Board) appeal from the August 24, 2023 order of the Court of

Common Pleas of Lawrence County (trial court) granting Bonnie Williams' (Bonnie) and Laura Crawford's (Laura) (collectively, Former Spouses) Petitions for Review from decisions of the City Council, which denied Former Spouses survivor benefits under the City's Police Pension Plan (the Plan). Upon careful review, we affirm, under the doctrine of equitable estoppel, the trial court's order which granted the Petitions for Review filed in the trial court by Former Spouses.[1]

## I. Background

To properly frame Former Spouses' requests for survivor benefits, we begin with the provisions of the Plan. Section 169.01 of the Plan provides the Plan's definitions; the following of which are relevant to this matter:

> (8) "Beneficiary" shall mean the person or legal entity designated by the Participant to receive any applicable benefits under the Plan payable upon the occurrence of the death of the Participant. In the event that a Participant does not designate a Beneficiary or the Beneficiary does not survive the Participant, the Beneficiary shall be the surviving spouse, or if there is no surviving spouse, the issue, per stirpes, or if there is no surviving issue, the estate; but if no personal representative has been appointed, to those persons who would be entitled to the estate under the intestacy laws of the Commonwealth of Pennsylvania if the Participant had died intestate and a resident of Pennsylvania. (Ord. 7227. Adopted 09-14-1995)

[1] In its August 24, 2023 order, the trial court clearly set forth its disposition in paragraph 1 of the order including subparagraphs (a) and (b). We affirm this disposition. The trial court then went on to explain its reasoning in reaching the decision. It is common practice for an opinion and analysis to precede an order. We affirm orders not opinions, but in this instance in effect the opinion is contained within the body of the order. As explained in greater detail, *infra*, we do not agree with all the reasoning set forth by the trial court in its explanation of how it reached its determination, but nonetheless we affirm the ultimate disposition. "We may of course affirm the decision of the trial court if the result is correct on any ground without regard to the grounds relied on by the trial court." *Mazer v. Williams Bros. Co.*, 337 A.2d 559, 563 n.6 (Pa. 1975) (citations omitted). Where we part ways with the trial court's reasoning will be explained in this Opinion; our Order affirming the trial court should be read consistent with this opinion.

(9) "Chief Administrative Officer" shall mean the person designated by the Employer who has primary responsibility for the execution of the administrative affairs of the Plan. (Ord. 7227. Adopted 09-14-1995)

Reproduced Record (R.R.) at 117a. The Plan does not contain a definition of spouse or surviving spouse. *Id.* Section 169.06 of the Plan governs death benefits and provides, in relevant part:

> (b) <u>Survivor Benefit</u>. **If a Participant here under who is receiving a** [**normal**, late, disability, or deferred **retirement benefit under the Plan**] or is eligible to receive a [normal, late, or deferred retirement benefit under the Plan] **shall die**, or if a Participant shall be killed in the line of duty of Employment, **and be survived by a spouse or any children under the age of eighteen (18)**, **there shall be a Survivor Benefit payable hereunder**. The Survivor Benefit shall be paid to the surviving spouse until the date of death of the surviving spouse. Upon the death of the surviving spouse or upon the death of the Participant with no surviving spouse but with any surviving children under age eighteen (18), the Survivor Benefit shall be paid in equal shares to the surviving dependent children of the deceased Participant. Dependent children shall include the children of the deceased Participant who have not attained eighteen (18) years of age. The shares payable to the surviving dependent children shall be adjusted as each child ceases to be eligible to receive a share of the benefit hereunder. (Ord. 7632. Adopted 08-21-2003.)

> . . . .

> (e) <u>Death After Retirement</u>. If a Participant hereunder who is receiving a [normal retirement benefit under the Plan] shall die and be survived by a spouse, there shall be a benefit payable hereunder to such surviving spouse until the date of death of the surviving spouse. . . . If a Participant shall die after becoming eligible for payment of a [normal retirement benefit under the Plan] or after commencement of a [normal or disability retirement benefit under the Plan] and without eligibility for payment of a survivor benefit under Subsection (b) of Section 169.06 or a surviving spouse benefit under this Subsection, and the total amount of benefits paid to the Participant does not at least equal or exceed the Participant's Accumulated Contributions as of the date of death, there shall be paid to the Beneficiary an amount equal to the difference between the amount of benefits paid and the amount of the

3

Participant's Accumulated Contributions. If the benefits paid exceed the amount of the Participant's Accumulated Contributions, there shall be no additional amount due or payable hereunder. (Ord. 7632. Adopted 08-21-2003.)

*Id.* at 127a-28a (emphasis added).

Section 169.07(h) of the Plan governs distributions of benefits under a Qualified Domestic Relations Order (QDRO) and provides that "**[a]ll rights and benefits, including elections, provided to a Participant in this Plan** shall be subject to the rights afforded to an 'alternate payee' pursuant to a domestic relations order as provided by applicable state law." R.R. at 131a (emphasis added). In addition, Section 169.09 of the Plan governs administration of the Plan and provides as follows:

> (a)  Plan Administrator. The [Board] shall be the Plan Administrator and shall have the power and authority to do all acts and to execute, acknowledge and deliver all instruments necessary to implement and effectuate the purpose of this Plan. . . .
>
> . . . .
>
> (c)  Authority and Duties of the Plan Administrator. The Plan Administrator shall have full power and authority to do whatever shall, in its judgment, be reasonably necessary for the proper administration and operation of the Plan. The interpretation or construction placed upon any term or provision of the Plan by the Plan Administrator or any action of the Plan Administrator taken in good faith shall be final and conclusive upon all parties hereto, whether Employees, Participants or other persons concerned. By way or specification and not limitation and except as specifically limited hereafter, the Plan Administrator is authorized: (Ord. 7227. Adopted 09-14-1995)
>
> > (1)  to construe the Plan; (Ord. 7227. Adopted 09-14-1995)
> >
> > . . . .

4

(3)     to compute the amount and source of any benefit payable hereunder to any Participant or Beneficiary; (Ord. 7227. Adopted 09-14-1995)

(4)     to authorize any disbursements; (Ord. 7227. Adopted 09-14-1995)

. . . .

**The Plan Administrator in its capacity as Plan Administrator shall have no power to add to, subtract from, or modify the terms of the Plan or change or add to any benefits provided by the Plan, or to waive or fail to apply any requirements of eligibility for benefits under the Plan.** Further, the Plan Administrator shall have no power to adopt, amend, or terminate the Plan, or to determine or require any contributions to the Plan, said powers being exclusively reserved to the Council in its capacity as the governing body of the Employer. (Ord. 7227. Adopted 09-14-1995)

R.R. at 134a-36a (emphasis added).

With these Plan provisions in mind, we turn to the facts of these matters, which the parties stipulated at their hearings before the City Council. *See* Original Record, (O.R.1),[2] Item No. 5, Joint Stipulation of Facts; O.R.2, Item No. 5, Joint Stipulation of Facts.[3] Because the underlying facts are not contested in this matter, we adopt the trial court's succinct recitation of those facts, as follows:

[Bonnie] married Ronald Williams on November 9, 1968. Ronald was employed by the [City] as a . . . [p]oliceman and retired in February, 1998. Ronald and Bonnie separated in August, 1998, and a divorce was filed in the [trial court]. Bonnie's attorney . . . prepared a [QDRO],[4]

---

[2]   Although the trial court consolidated these matters for disposition, Former Spouses separately appealed to this Court. The trial court submitted separate Original Records to this Court before we consolidated these matters. Therefore, we differentiate the Original Records by docket number: O.R.1 is from Bonnie's case (1088 C.D. 2023) and O.R.2 is from Laura's case (1089 C.D. 2023).

[3]   The parties entered these Joint Stipulations of Fact as exhibits at the City Council's hearings.

[4]   While the order would be more properly termed a domestic relations order, or DRO, because it does not become a qualified domestic relations order, or QDRO, until the Plan qualifies it, for consistency we refer to it and all other domestic relations orders, as QDROs.

5

for the purpose of implementing a Property Settlement Agreement whereby Bonnie and Ronald agreed that Bonnie would receive a portion of Ronald's retirement benefits during his life, and, if she survived him, that she would receive the survivor portion of his retirement benefits as his spouse.

The draft QDRO was first submitted to the [City] / [Pension Board] for review. The City's contact person, . . . [the] Business Administrator for the [City,] advised [Bonnie's attorney], pursuant to letter dated September 26, 2001, that the draft QDRO was approved by the City/[Pension Board].

The QDRO was approved by the [trial court] on October 11, 2001, and shortly thereafter, implemented by the [Board]. Pursuant to the terms of the QDRO, . . . Bonnie received part of Ronald Williams' retirement benefits.

While there was correspondence from the [Pension Board's new] attorney . . . to [Bonnie's attorney] on August 16, 2007, challenging the validity of the payment of survivorship benefits to Bonnie should she survive Ronald, [Bonnie's attorney] responded and reiterated the provisions of the QDRO, and the City/[Pension Board's] prior approval, and nothing more was forthcoming from the City/[Pension Board], or [the Pension Board's new attorney], until a claim was made by Bonnie after Ronald's passing.

Ronald Williams died March 16, 2019, and . . . Bonnie submitted her claim for survivor benefits based upon the QDRO. The . . . [Pension Board] denied Bonnie Williams' claim on June 13, 2019, and Bonnie requested a review of the denial by City Council.

City Council had a hearing on this matter on December 10, 2019, and voted to deny the benefits on December 13, 2019. . . . .

On January 21, 2020, Bonnie filed a Petition for Review[5] with the [trial court] . . . .

Trial Ct. Op., 8/24/23, at 2-3.

---

[5] Before addressing the merits of Bonnie's appeal, the trial court remanded this matter to the City Council with instructions to issue a written adjudication. Trial Ct. Op., 8/24/23, at 4. City Council then issued a written adjudication, and Bonnie's appeal proceeded in the trial court. *Id.*

6

With respect to the underlying facts of Laura's case, the trial court explained she

> was formerly married to Ernest Crawford, a longtime city police officer who retired in March, 1981. Laura and Ernest separated on February 29, 1988[,] and Ernest filed for divorce.
>
> In 1997, Laura and Ernest entered into a Marital Settlement Agreement which addressed, in part, Ernest's police pension with the [City]. Pursuant to that agreement, Laura and Ernest executed a QDRO, which the [trial court] entered as an Order on March 18, 1997. Ernest and Laura divorced on May 30, 1997, at which time[] Ernest's pension was in pay status. The QDRO named Laura as the "surviving spouse" to Ernest's pension in the event of his death. No Appeal was taken from the March 18, 1997 Order. During Ernest's lifetime, the City implemented the QDRO and paid Laura a portion of Ernest's monthly pension. Prior to executing the QDRO, Laura's then legal counsel inquired of the [Plan] whether the Plan would continue to pay a share of Ernest's pension to Laura if she had in place a QDRO prior to their divorce. The City's then solicitor, . . . on behalf of the City and [Pension Board], responded and indicated that the [Plan] would continue to pay benefits to an ex-spouse provided a QDRO was in place prior to divorce. Ernest died on February 7, 1999[,] and after his death, Laura received survivor benefits from the Plan continuously until September, 2019, when the Plan unilaterally terminated such benefits without [providing] a prior hearing to Laura.
>
> Laura challenged the termination of benefits with the Pension Board and the Pension Board denied her claim on April 9, 2020. In accordance with the Plan terms, Laura requested a review of the denial by City Council. City Council held a hearing on October 20, 2020, and at a public meeting on November 19, 2020, City Council voted to deny Laura's claim for benefits. The City's Adjudication adopted in total the Findings of Fact and Conclusions of Law submitted by [the Board's counsel].

Trial Ct. Op., 8/24/23, at 5-6. Like Bonnie, Laura filed a Petition for Review in the trial court. *Id.* at 8.

After holding a status conference, the trial court entered a case management order which: (1) noted it previously consolidated these matters "for discovery purposes only" with Bonnie's and Laura's separate civil actions against the City and Pension Board; (2) consolidated the present matters for hearing and resolution; and (3) provided:

> If counsel for [any of the parties] believes that the present record in each of the cases is not complete, counsel may either present, via stipulation, additional facts which counsel desire to be included in the record, or if no agreement for stipulation is possible, counsel shall present a motion to the [trial court] and the [trial court] will decide whether or not the current record in the case is complete or whether a party is entitled to present additional facts to be included in the record.

O.R.1, Item No. 12 at 2. Shortly thereafter, Former Spouses, the City, and the Pension Board requested a consent order, which the trial court granted, permitting the parties to supplement the City Council's records with deposition transcripts, interrogatories, and documents produced in discovery. *Id.*, Item No. 13. The parties supplemented the record by agreement, and the trial court held oral argument on Former Spouses' appeals. *Id.*, Items No. 12 at 15-22.

The trial court issued its Opinion and Order on August 24, 2023. The trial court determined that, pursuant to Section 754(b) of the Local Agency Law,[6] 2 Pa.C.S. § 754(b), there was a full and complete record of the proceedings before City Council. Trial Ct. Op., 8/24/23,[7] at 8, 12. Nevertheless, the trial court stated it would "decide this matter based upon the record before the [City Council] as supplemented by agreement of legal counsel." *Id.* at 8.

---

[6] 2 Pa.C.S. §§ 551-555, 751-754.

[7] The trial court's opinion and order is Item No. 24 in O.R.1 and Item No. 26 in O.R.2.

Next, the trial court rejected the City and Pension Board's arguments that the Plan does not include ex-spouses as surviving spouses. *See id.* at 14-15. The trial court then determined the City and Pension Board "essentially adopted and applied the [Plan] terms to include an 'ex-spouse' as a 'surviving spouse,' where there is in place a QDRO so identifying the specific 'ex-spouse' to be a 'surviving spouse.'" *Id.* at 15.

Finally, the trial court determined the City and Pension Board reviewed Former Spouses' QDROs, approved them, and "willingly implemented" them. *Id.* at 16. The trial court found it was "simply disingenuous" for the City and Pension Board to change their position after approving and implementing Former Spouses' QDROs for many years. *Id.* The trial court concluded Former Spouses justifiably relied upon the Pension Board's correspondence to their detriment and permitting the City to deny Former Spouses' claims for survivor benefits would be a fundamental injustice. *Id.* at 17-19. Therefore, the trial court granted Former Spouses' Petitions for Review and ordered the City and Pension Board to pay Former Spouses' claims for survivor benefits, retroactive to Bonnie's application for survivor benefits and Laura's termination of survivor benefits. *Id.* at 24-25.

In its opinion in support of order, which it filed pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), Pa. R.A.P. 1925(a), the trial court clarified it

> did not find that upon the plain language of the [Plan], an ex-spouse is synonymous with a spouse; but . . . that under the [P]lan, . . . the ex-husbands of [Former Spouses] had the right to designate the right of a surviving spouse to their ex-spouses, under a QDRO, because the [Plan] . . . does not, upon a plain language analysis, prohibit such an assignment.

O.R.1, Item No. 37 at 10. Therefore, the trial court determined Ronald Williams and Ernest Crawford validly assigned survivor benefits to Former Spouses through their

9

respective QDROs.  *Id.* at 17.  With respect to equity, the trial court clarified that Former Spouses

> both relied, to their detriment, on an affirmation by the [Pension Board] and the solicitor for the [City] and their acquiescence to the QDROs. Additionally, . . . the [City and Pension Board] acted in accordance with [Former Spouses'] belief and [Former Spouses] would be substantially harmed, amounting to a fundamental injustice, if the government, by way of its agents, was not bound by such misrepresentations and affirmations.

*Id.* at 13.  Consequently, the trial court also concluded the City and Pension Board should be estopped from enforcing the Plan's limitation of survivor benefits to a spouse.  *Id.* at 13-14.  The City and Pension Board timely appealed the trial court's order to this Court.

## II.    Issues

The City and Pension Board raised numerous issues[8] for our review, which we have condensed into four essential issues: (1) whether the trial court applied an improper scope and standard of review; (2) whether the trial court erred in determining Former Spouses were entitled to receive survivor benefits under the Plan; (3) whether the trial court erred in determining the City or Pension Board interpreted or amended the Plan to include ex-spouses as surviving spouses; and (4) whether the trial court erred in determining the Pension Board should be estopped from terminating Laura's survivor benefits and denying Bonnie's claim for survivor benefits.

---

[8] The City and Pension Board presented seven questions in their Statement of Questions Involved.  Each question contained multiple, intertwined, and often overlapping issues.

10

## III. Analysis

When a court of common pleas does not take additional evidence,[9] we review a local agency's adjudication to determine whether the local agency[10] violated the parties' constitutional rights or rules of agency practice and procedure, whether the local agency committed an error of law, or whether sufficient evidence supports the local agencies' findings of fact. *Havelka v. Ret. Bd. of Allegheny Cnty.*, 229 A.3d 391, 394 n.4 (Pa. Cmwlth. 2020).

### A. Scope and Standard of Review

The City and Pension Board's first issue for review is whether the trial court applied an improper scope of review. However, because we do not review the determinations of the trial court, but instead we review the determinations of the City Council, whether the trial court applied an improper standard of review would typically be of little significance. Nevertheless, we examine the trial court's standard of review due to its impact on our disposition.

The trial court claimed it was applying the scope and standard of review outlined in Section 754(b) of the Local Agency Law, which provides:

> **In the event a full and complete record of the proceedings before the local agency was made, the court shall hear the appeal without a jury on the record certified by the agency.** After hearing the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of Subchapter B of Chapter 5 (relating to practice and procedure of local agencies) have been violated in the proceedings before the agency, or that any finding of

---

[9] While the trial court accepted additional evidence in these matters, for the reasons set forth below, the trial court erred in doing so.

[10] Although the trial court rendered the decision from which the City and Pension Board appealed, we review the City Council's (the local agency's) adjudication. *See Guadalupe v. Phila. Bd. of Pensions & Ret.*, 243 A.3d 1020, 1023 n.1 (Pa. Cmwlth. 2020).

fact made by the agency and necessary to support its adjudication is not supported by substantial evidence.

2 Pa.C.S. § 754(b) (emphasis added). The City and Pension Board assert the trial court exceeded this scope of review by making its own factual findings. *See* Appellants' Br. at 35. Former Spouses assert the trial court was entitled to engage in a *de novo* review because the parties supplemented the record before the City Council with depositions and exhibits, meaning the local agency record was not a full and complete record. *See* Appellees' Br. at 18.

This Court has previously explained

a "full and complete record" [is] "a complete and accurate record of the testimony taken so that the appellant is given a base upon which he may appeal and, also, that the appellate court is given a sufficient record upon which to rule on the questions presented." *In re Thompson*, 896 A.2d 659, 668 (Pa. Cmwlth. 2006) . . . . Only if the trial court determines that the record before the agency is incomplete, does it have discretion to hear the appeal *de novo* or remand to the local agency. *Retirement Board of Allegheny County v. Colville*, 852 A.2d 445, 450 (Pa. Cmwlth. 2004).

Situations in which a record has been deemed incomplete include such instances where the record fails to contain a transcript of the proceedings before the local agency, *McLaughlin v. Centre County Housing Authority*, . . . 616 A.2d 1073 ([Pa. Cmwlth.] 1992), or where a party refuses to provide relevant and necessary documentation to the local agency, *School District of the City of Erie v. Hamot Medical Center*, . . . 602 A.2d 407 ([Pa. Cmwlth.] 1992). However, "[t]he record before the local agency is not considered incomplete based solely on [a party's] failure to present evidence available at the hearing." *Colville*, 852 A.2d at 451. Indeed, in *Colville*, we stated that "[t]he trial court has no authority under [S]ection 754(b) of the Local Agency Law to remand a matter to the local agency to give the appellant another opportunity to prove what he or she should have proved in the first place." *Id.* (citations omitted).

12

*Kuziak v. Borough of Danville*, 125 A.3d 470, 475-76 (Pa. Cmwlth. 2015). Similarly, we have explained that "under Section 754(b) of the Local Agency Law, reopening [a local agency's] record to accept new evidence after [a] Board rendered its decision was not among the actions the trial court could take." *G.W. by H.W. v. Avonworth Sch. Dist.*, 297 A.3d 28, 36-37 (Pa. Cmwlth. 2023). As a result, in *G.W.* we determined it was erroneous for a trial court to permit the parties to take a deposition in a local agency appeal. *Id.*

Here, the records of City Council's hearings for both Bonnie and Laura are full and complete because the hearings were transcribed. *See Kuziak*, 125 A.3d at 475-76. Therefore, the trial court committed an error of law when it permitted the parties to reopen City Council's records and submit new evidence[11] rather than conducting an appellate style review of the City Council's decisions pursuant to the scope and standard of review set forth in Section 754(b) of the Local Agency Law. *See G.W.*, 297 A.3d at 37.

The trial court compounded this error by appearing to engage in a *de novo* review,[12] frequently reaching its own findings and conclusions without addressing

---

[11] We note Pennsylvania has several statutory provisions which expressly provide Courts of Common Pleas with authority, in limited circumstances, to accept supplemental evidence in local agency appeals. *See e.g.* Section 1005-A of the Pennsylvania Municipalities Planning Code, Act of July 31, 1968, P.L. 805, *as amended*, added by the Act of December 21, 1988, P.L. 1329, 53 P.S. § 11005-A. Nevertheless, the Local Agency Law does not contain any similar provisions and expressly provides that when "a full and complete record of the proceedings before the local agency was made, the court **shall** hear the appeal . . . on the record certified by the agency." 2 Pa.C.S. § 754(b) (emphasis added). This mandatory language requires Courts of Common Pleas to hear appeals under the Local Agency Law on the record certified by the agency. *See G.W*, 297 A.3d at 36-37.

[12] The trial court's apparent engagement in a *de novo* review was logical in that there would have been no purpose for accepting new evidence if the trial court were to remain bound by the City Council's factual findings and conclusions of law. Thus, the trial court's error in engaging in a *de novo* review was a product of its error in accepting additional evidence.

13

the City Council's findings and conclusions. *See generally* O.R.1, Item No. 24. To the extent the trial court's order included new findings of fact and exceeded the trial court's proper review, this was error, however, the error was harmless because ultimately the trial court properly granted, explained *infra*, Former Spouses' requested relief.

## B. Survivor Benefits

The City and Pension Board's second issue is whether the trial court erred in determining Former Spouses were entitled to receive survivor benefits under the Plan. However, because we review the determinations of the City Council, we examine whether the City Council committed an error of law in determining Former Spouses were not entitled to receive survivor benefits under the Plan.

This Court was confronted with a similar question in *Maloney v. Maloney*, 754 A.2d 36 (Pa. Cmwlth. 2000). In *Maloney*, a municipal pension plan member (former husband) and his spouse (ex-spouse) divorced after former husband began receiving pension benefits. *Id.* at 37. The ex-spouse had a QDRO, which awarded her 50% of former husband's pension benefits. *Id.* at 38. Before the pension plan implemented the QDRO, however, former husband died. *Id.* Following former husband's death, the municipality refused to pay the ex-spouse, asserting she was not entitled to survivor benefits as an ex-spouse. *Id.* The pension plan at issue in *Maloney* provided that "if a retired [plan] member . . . dies, then **the member's spouse** . . . shall, during the lifetime of the spouse . . . be entitled to receive" survivor benefits. *Id.* (emphasis added). The trial court in *Maloney* ordered the municipal pension plan to qualify and implement the QDRO, thereby providing survivor benefits to the ex-spouse.

14

This Court reversed the trial court in *Maloney*, explaining that the pension plan's plain language does not provide survivor benefits to an ex-spouse. *Id.* at 39. This Court also explained QDROs may only require a pension plan "to provide a benefit or option already provided for by the plan." *Id.* Therefore, this Court concluded the trial court's order impermissibly "alter[ed] the benefit scheme of the plan [by] ordering the [municipality] to pay a benefit not previously contracted for." *Id.*

Here, Section 169.06(b) of the Plan provides that "if" a Plan participant who is receiving normal retirement benefits dies and is "**survived by a spouse** or any children under the age of eighteen (18), there shall be a [s]urvivor [b]enefit payable hereunder." R.R. at 127a (emphasis added). Like in *Maloney*, the Plan's plain language reveals that the Plan does not provide survivor benefits to an ex-spouse. Instead, only a current spouse or minor children, living at the time a Participant dies, may have rights to a survivor benefit under the Plan. Therefore, like in *Maloney*, any QDROs purporting to award survivor benefits to a person not entitled to such benefits under the Plan would impermissibly "alter[] the benefit scheme of the [P]lan." *Maloney*, 754 A.2d at 39.

Accordingly, we conclude the City Council did not commit an error of law when it determined Former Spouses were not entitled to receive survivor benefits under the Plan. To the extent the trial court determined Ronald Williams and Ernest Crawford validly assigned survivor benefits to Former Spouses, we reverse that portion of the trial court's order.

## C. City and Pension Board's Interpretation or Amendment of the Plan

The City and Pension Board's third issue for review is whether the trial court erred in determining the City or Pension Board interpreted or amended the Plan to

include ex-spouses as surviving spouses. Because we review the determinations of the City Council, however, we will examine whether the City Council committed an error of law in determining neither the City nor the Pension Board interpreted or amended the Plan to provide survivor benefits to a Participant's ex-spouse.

Regardless of any actions taken by the City, Pension Board, or their agents, Section 169.09(c) of the Plan provides that the "Plan Administrator[13] . . . shall have no power to add to . . . or modify the terms of the Plan or change or add to any benefits provided by the Plan, or to waive or fail to apply any requirements of eligibility for benefits under the Plan." As a result, even if the City, Pension Board, or their agents purported to provide Former Spouses with benefits which exceeded those the Plan provided, the Plan did not give the City, Pension Board, or their agents any authority to do so. Rather, the Plan specifically provided the Plan Administrator shall have "no power" to add to or modify terms, or to change any benefits of the Plan.

Consequently, the City Council did not commit an error of law when it determined the City and Pension Board did not interpret or amend the Plan to permit an award of survivor benefits to ex-spouses. Regardless, however, as explained *infra*, because we agree with the trial court that the Pension Board should be estopped from terminating Former Spouses' survivor benefits, the trial court's determinations related to whether the Plan had been amended do not change the outcome on appeal.

**D. Estoppel**

The City and Pension Board's final issue for review is whether the trial court erred in determining the Pension Board should be estopped from terminating Laura's

---

[13] Section 169.09(a) of the Plan establishes that the Pension Board is the Plan Administrator.

survivor benefits and denying Bonnie's claim for survivor benefits. Because we review the determinations of the City Council, however, we will examine whether the City Council committed an error of law in determining the City and Pension Board should not be estopped from terminating Laura's survivor benefits and denying Bonnie's claim for survivor benefits. City Council's relevant conclusions of law are as follows:

> 21. Claimant contends that approval of a QDRO by the City Business Administrator effectively binds the City to treat the ex-spouse as spouse and pay the surviving spouse benefits to the ex-spouse.
>
> 22. Pennsylvania law is clear; government officials and employees cannot bind a government or positive law that provides otherwise.
>
> 23. Pennsylvania governmental entities cannot be bound by actions of its officials or local employees where, as here, a City Ordinance [(the Plan)] provides otherwise.

Trail Ct. Op., 8/24/23, at 11.

> We have explained:
>
> The doctrine of equitable estoppel prevents a party from acting differently than the manner in which it induced another party to expect. The doctrine may be applied to a Commonwealth agency when the party asserting estoppel establishes by clear, precise unequivocal evidence that: (1) the agency intentionally or negligently misrepresented a material fact; (2) the agency knew or had reason to know that the party would justifiably rely on the misrepresentation; and (3) the party acted to his or her detriment by justifiably relying on the misrepresentation.

*Quinn v. Dep't of State, Bureau of Prof. & Occupational Affs.*, 650 A.2d 1182, 1184 (Pa. Cmwlth. 1994) (citations omitted). "Because equitable estoppel is a doctrine of equity and fundamental fairness, its applicability depends on the specific facts of

17

each case." *Carroll v. City of Phila., Bd. of Pensions and Ret. Mun. Pension Fund*, 735 A.2d 141, 144 (Pa. Cmwlth. 1999).

The Pennsylvania Supreme Court established the "Commonwealth or its subdivisions and municipalities cannot be estopped by 'the acts of its agents and employees if those acts are outside the agent's powers, in violation of positive law, or acts which require legislative or executive action.'" *Cent. Storage & Transfer Co. v. Kaplan*, 410 A.2d 292, 294 (Pa. 1979) (citation omitted). Nevertheless, our Supreme Court has stated "this rule cannot be slavishly applied where doing so would result in a fundamental injustice." *Chester Extended Care Ctr. v. Dep't of Pub. Welfare*, 586 A.2d 379, 383 (Pa. 1991).

In *Chester*, the United States Department of Health and Human Services (HHS) terminated a nursing home's license to participate in the Medicare program. *Chester*, 586 A.2d at 380. Thereafter, the Pennsylvania Department of Public Welfare (DPW), now Human Services, granted the nursing home a six-month provisional license, recommended to HHS that the nursing home remain licensed, refrained from removing patients from the nursing home, routinely certified new patients for admission to the nursing home, and continued to submit payments to the nursing home. *Id.* at 380-81. After HHS upheld its termination of the nursing home's license, DPW notified the nursing home it was ineligible to receive payments after HHS initially terminated its license and that DPW was seeking reimbursement for those payments it made after that date. *Id.* at 381.

Under those facts, our Supreme Court determined it "would clearly be a fundamental injustice to hold [the facility] responsible for the cost of caring for its Medical Assistance patients." *Id.* at 383. As a result, the Supreme Court estopped the DPW from recovering the payments (approximately $250,000) it made to the

18

nursing home. *Id.* at 380. In *Carroll*, we characterized *Chester* as "involv[ing] an unusual situation[] where [a] Commonwealth agenc[y] committed [an act] that unfairly lulled [a] medical assistance provider[] into assuming substantial costs of medical treatment for the indigent." *Carroll*, 735 A.2d at 146.

Here, the City, Pension Board, and their agents led Former Spouses to believe their QDROs would provide them with survivor benefits under the Plan. Further, the City, Pension Board, and their agents approved Former Spouses' QDROs and implemented them for years. In Laura's case, the City also paid her survivor benefits, pursuant to her QDRO, for over 20 years. Under the specific facts of Former Spouses' cases, we conclude the City, Pension Board, and their agents negligently misrepresented to Former Spouses that the Plan would provide Former Spouses with survivor benefits. Because Former Spouses both contacted the City and Pension Board for assistance in drafting their QDROs to ensure they would receive Plan benefits for their entire lives, the City and Pension Board had reason to know Former Spouses would rely on their representations. Finally, Former Spouses justifiably relied on the City and Pension Board's communications and actions to their detriment, because they are not currently receiving the survivor benefits that they bargained for in their divorce proceedings.

Having concluded Former Spouses have established the elements of equitable estoppel, we note that the actions of the City, Pension Board, and their agents were outside their powers and in violation of the Plan, as fully outlined above. Therefore, we must determine if a fundamental injustice exists such that equitable estoppel is appropriate against the City and Pension Board.

Former Spouses both contacted the City and Pension Board while they were negotiating their divorce settlements to determine if and how they could ensure

19

receipt of pension benefits for the rest of their natural lives, regardless of whether their ex-spouses, the Plan Participants, predeceased them. Based upon the City and Pension Board's responses, Former Spouses negotiated their divorce settlements in reliance on the guarantee they would receive benefits from the Plan throughout their entire lives. The Pension Board or its agents approved Former Spouses' draft QDROs and then adopted and implemented the QDROs after they were filed as court orders. The Plan then paid Former Spouses according to their QDROs for years, including paying Laura survivor benefits for over 20 years. Similar to *Chester*, the City and the Pension Board "unfairly lulled" Former Spouses into believing they would receive Pension benefits throughout their lifetimes. *See Carroll*, 735 A.2d at 146.

Accordingly, we conclude Former Spouses have established that a fundamental injustice would occur if the City and Pension Board were not estopped from denying Former Spouses' claims for survivor benefits. Further, we conclude the City Council committed an error of law when it determined the City and Pension Board should not be estopped from terminating Laura's survivor benefits and denying Bonnie's Claims for survivor benefits. As a result, we affirm the trial court's disposition.

## IV. Conclusion

While we agree with the City and Pension Board that the trial court erred in its application of the scope and standard of review, and we likewise agree that some of the reasoning by the trial court was flawed, as detailed above, we ultimately agree with the trial court's disposition. Accordingly, we affirm.

 

 

_____
STACY WALLACE, Judge

20

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Bonnie Williams             : **CASES CONSOLIDATED**
                                        :
        v.                           :
                                        :
City of New Castle and Police     :
Pension Board for the City of       :
New Castle,                        :
              Appellants    : No. 1088 C.D. 2023


Laura Crawford                 :
                                        :
        v.                           :
                                        :
City of New Castle and Police     :
Pension Board for the City of       :
New Castle,                        : No. 1089 C.D. 2023
              Appellants    :


# O R D E R

     **AND NOW**, this 16th day of April 2025, the order of the Court of Common Pleas of Lawrence County dated August 24, 2023, granting the Petitions for Review filed in the trial court, is hereby **AFFIRMED**.


                                     _____

                                     STACY WALLACE, Judge